19-306-12, Martin Energy v. Bourbon Petrel and CGG Services. Mr. Diaz. Yes, sir. Good morning, and may it please the Court, my name is Tom Diaz. I'm with Lisco & Lewis in New Orleans, and I represent the appellants in this matter. As reflected partially by the caption of the case, this is Martin Energy v. Bourbon Petrel. Bourbon Petrel is one of the three vessels that were subject to seizure in the court below. The appellants are effectively two CGG entities, and those are part of a geophysical company that was conducting a geophysical survey off the coast of Louisiana in 2014, in the fall of 2014. And the other appellants are the owners of the three vessels at issue. And this case, I believe, presents a fascinating opportunity to address how necessaries are analyzed under maritime law and the extent to which or the limitations upon which must be imposed, depending on how necessaries are defined. And here, this is not a typical maritime lien necessaries case, because what this court has experienced in the last couple of decades, including the Equalese case as well as the Golden Princess case, is an expansion of maritime liens and whether they apply to certain intangible issues which support the function of a vessel as it plies the waters and is engaged in maritime commerce. Here we are dealing with bunkers, with fuel, which for the last 100 years the United States Supreme Court has recognized as being a necessary under both general maritime law before the Federal Maritime Lien Act and the Commercial Instruments Lien Act was enacted, and then subsequent to it. And that began with the United States Supreme Court case in the Piedmont. Now, Piedmont didn't involve fuel oil, which is the modern iteration or a more modern iteration of what propelled a vessel. It dealt with coal and the supplying of coal in support of a vessel's function. But I think it is essential to look back to those very simple precepts of what a necessary is as announced by the Supreme Court in the Piedmont, and that is whether it is something that is necessary for a vessel to move from place to place, to move from place to place. Now, Judge Fallon obviously knows this area of law well, and his order cited multiple decisions, the most recent one being the First Circuit Nova Star case. Do you remember the decisions that Judge Fallon relied on? I do. I don't. I recall, and I can look at it in a moment, what was involved in the Nova Star. That's the ferry boats going up in the Nova Scotia area. Oh, right. And he cites it appropriately for the fact that linens on the boat were deemed necessary. Now, linens don't help that boat move from place to place. So his body of cases where advertising is a necessary, linen is a necessary, containers on a container ship are necessary, might suggest that the ruling here was correct, that necessary doesn't just mean necessary to propel. I think the Nova Star decision as well as the Equalese decision are appropriate expansions of what should be considered necessaries under maritime law when you look at what is needed for that vessel to perform its function. So when you have a ferry— So it's not propulsion, it's perform, it's function. No, true, but though I did not want to lose sight of the fact that we are dealing with here is fuel for propulsion. So going into the Nova Star case or Equalese or others where you look at either intangible issues like insurance or something that is not considered to be traditionally maritime like liquor for passengers or linens on beds of ferries— Am I oversimplifying to say your rule of law then is necessary for that ship, not necessary for the ship that it's going to? Is that the simple proposition? That is a simple proposition. And when you look at the Supreme Court decisions in terms of the use of fuel and which vessel it is necessary for, that is an absolutely fundamental question that has to be answered in this case. So hypothetically then these seismic vessels, there may be a lien with respect to those vessels as to the fuel that's going to them because they're going to use that to propel themselves. Absolutely. And here we have support vessels who, with the possible exception of the Lilly, are not using that fuel for their own ship. Correct. Not only not using it for their own propulsion, not using it for the ship, but they are physically incapable of using that fuel for their own propulsion. There is no mechanism in order to get that Martin Energy fuel from the cargo tanks of the Bourbon Patrel or the OMS Resolution into the day tanks of those two vessels. And therefore it cannot propel the vessels under the uncontested facts as presented to the trial court. Well, I wish that the exception had, I'm sorry, the necessary had remained as clear cut as the Supreme Court opinion 100 years ago. But when all of a sudden you're reading these cases that talk about advertising for the vessel, linen for the vessel, and you can say, yeah, but that's because they're cruise ships and you have to have passengers on a cruise ship. Well, all of a sudden we're no longer tied to necessary for the ship's propulsion or the ship's safety. For example, if the ship runs aground and doesn't have the funds to be repaired, but it's got to be repaired to get from Bora Bora to New York City, it borrows money and there's a lien on the vessel. So how do you rationalize these cases that have, I hate to use a pun, gone so far overboard? And now we're talking about advertising and linens. And Judge Bartdale, I agree with you, but I think the way you posited the question to me answers the question, and that is advertising for the vessel and insurance for the vessel's subject to seizure. But it's a small step from for the function of the vessel to for the venture of it, the purpose of it. And then Judge Fallon says these are sort of floating, what do you call them, floating? Floating gas stations. Floating gas stations. So then you could say, well, its whole function is to carry gas. They're carrying gas. Where's the incorrect leap? Well, the incorrect leap is under the Maritime Lien Act. The necessary needs to be associated with the vessel subject to seizure. But it could be something necessary to both, and then you get into the Lilly situation, right? I don't – No? No, I don't. Well, I think we ought to get into the Lilly because it does require, I think, some further discussion. Okay. But with the Bourbon-Patrel and OMS resolution, for example, if they can't even transfer the fuel to their day tanks and they are physically incapable of using the fuel propulsion, then under the Maritime Lien Act, it is not a necessary for that vessel. And Mr. McMullen's testimony was crystal clear on that. Correct. But then there's the Lilly. Then there is the Lilly. And the Lilly does present an issue where there is a physical connection between the cargo tanks and the day tanks. And this was an aberration, at least in terms of this geophysical survey. It was a new captain aboard the Lilly who was not supposed to be transferring that fuel from the cargo tanks to the day tanks, but he did and did a very modest amount. But the important thing was it's approximately 12,000 gallons, and the fuel aboard the vessel at the time it arrived in Port Fouchon was more than that, so that we have a circumstance where a vessel shows up at a port, and the question becomes, does that vessel have the fuel and cables and anchors and water for its own crew sufficient in order for it to accomplish its voyage? And here, it was uncontested in the court below that the Miss Lilly did. And when she is in Port Fouchon, we would be talking about a very different circumstance here if under the other unusual circumstances of the Miss Lilly where she had to actually take three trips offshore due to weather conditions in order to transfer the volumes in her cargo tanks to the seismic vessels offshore. Had it been a circumstance where she burned more fuel than what she had on board when she arrived in Port Fouchon, I would be probably not making the argument before you right now. And it might be a slight variation. Because to the extent that that fuel was used for propulsion, it would presumably be a necessary to the Miss Lilly. Would that be—is that right? If the fuel was required for her trips offshore, I would agree that would be a necessary for her propulsion. But she had sufficient fuel on board in order to make the journeys offshore to the seismic vessels. Those volumes were transferred to the seismic vessels before she had ever consumed the fuel that she already had on board. And under a strictly jurisinterpretation of maritime liens, which are a secret lien which attaches as an operation of law, that it shouldn't be extended where the uncontested facts below show that she already had enough fuel and other equipment on board to where her voyage did not need any additional fuel. Judge Barstow asked about the law has spread quite considerably. Does your position require us to distinguish or disagree with any other circuit? And in particular, I'm wondering about this Judge Fallon citation to the Ninth Circuit false launch case. I believe no. And frankly, I was thankful that we had a one-day bench trial effectively to establish that the facts were uncontested. Because it is at that trial that facts were disclosed by Mr. McMullen that show how FOSS Maritime actually supports CGG's position here. Because recall that FOSS Maritime— Can you stay in front of the microphone? Oh, I'm sorry. I tend to wander. FOSS Maritime involved the provisioning of containers put onto a vessel in order for it to carry cargo. And without those containers, it could not carry the cargo, which was the function of that vessel. And so the Ninth Circuit in FOSS Maritime says the provisioning of the containers, not the cargo that was put in the containers. The containers themselves. The containers themselves. And the interesting juxtaposition with our trial here before Judge Fallon is that the Miss Lily and the OMS resolution didn't have containers on those vessels either. The Bourbon Patrel was originally constructed as a seismic support vessel. It had dry goods, refrigerated, and freezer containers built into its hull. OMS resolution, Miss Lily did not. And prior to the seismic operations off the coast of Louisiana, CGG provisioned containers on the OMS resolution and on the Miss Lily so that she could perform her function of carrying dry goods, refrigerated goods, and frozen goods out to the seismic fleet. And the provisioning of those containers, had they not been paid for, would have given rise to a maritime lien under FOSS Maritime. Now, just for clarity on the record, when you're saying the provisioning of those containers to a layperson, they would think you're putting meat into the containers. What you're saying is they provided the containers. Correct. Now, what is your response to the fact that by the very fact the fuel was provided to these vessels and the maritime lien was maintained, that, in effect, there was a contract in which the lien was agreed to and that we should give some effect to that? Martin Energy reserved a lien, a maritime lien. Judge Barksdale, that was evidence that was presented at trial, and it is supported by the documentation that Martin has that it issues associated with all of its bunker supplies, its bunker certificates. I mean, these are unilateral certificates that are issued for which it specifically states that we are hereby not waiving any maritime lien that attaches as a matter of law. And that was relevant to the issue of whether Martin Energy had waived its lien. Because here we had an additional very peculiar set of facts where CGG used to buy this fuel for its seismic fleet and separately for the supply boats directly from Martin. And the question arose at trial of whether they waived that lien by contracting with O.W. Bunker, which really has inspired a remarkable amount of litigation when it went into bankruptcy. So bunkers have become a new du jour topic throughout all the circuit courts, including this one with Valero Marketing. But that is a waiver issue that we did not raise on appeal. I think that is appropriately something that was within the fact finding of Judge Fallon, and we did not raise the issue of waiver before the court. But that's simply related to the waiver issue only. And I think maritime law is exceptionally clear that you cannot create maritime liens for necessaries by contract. It is by operation of law only. Does the record confirm CGG did pay for this fuel? It just got only as far as Bunker, not all the way to Martin? Or is the record silent on that? Well, CGG paid for the fuel, but in a way that Judge Duncan had forecasted earlier. Because the GeoCeltic, one of the seismic vessels that consume the fuel here for its own propulsion, was seized in France by O.W. Bunker. And so CGG ultimately paid O.W. Bunker, who has alleged themselves and did in the trial court below that it has a lien for these supplies. On the seismic vessels? On the seismic vessels, because it was contractually required to supply that fuel to CGG. And it therefore went to France. It seized the GeoCeltic, and CGG had to release that vessel and paid for the fuel here. So this was a very odd circumstance where we had competing claims for liens. But this is also another strange case in which typically a company like CGG or an owner of the supply vessels here will simply place into the registry of the court the amount that's in dispute between O.W. Bunker and Martin Energy to find out who had the authority in order to commit the vessels to the purchase of this fuel. The problem was that we couldn't put the money into the registry of the court because the vessels that were subject to seizure were the ones that didn't have the liens attached to them. The liens attached by operation of maritime law to the seismic vessels because it was those vessels that consumed the fuel. Very interesting. You have time for rebuttal? I will save it for rebuttal. Thank you very much. Thank you. May it please the court. Let me start by asking you similar to the aquarium case we just had about the exceptions provided. And the examples in Simla referring to liens refer to repairs, supplies, towage, use of a dry dock and use of a crane or something. Certainly fuel that's going to be carried to another vessel doesn't fall within any of these. So how do you respond to the examples provided by Simla? I think I respond as Your Honor did at the beginning of Mr. Diaz's argument that since the institution of the Maritime Lien Act, the scope of that act has been interpreted more broadly than it might have been in 1911 or whatever the date of the act is. We have this court's in bond decision in Equalese that I think establishes the general parameter, which is whether the good or service enables the vessel to perform its particular function. And that is very broad. It extends far beyond propulsion. We've talked about the provision of linens. We've talked about the provision of liquor for passengers. Those are the cases that Judge Fallin cited. But it seemed to me reading the case law that after Equalese, our court realigned itself with other circuits in the specific situation where something is necessary to a destination vessel. And I'm thinking particularly maybe you missed this 1996 Silver Star case. Judge Garwood, Judge Jones went out of their way to say other courts are expansively interpreting necessary, but one thing it's not is if it's going to another vessel, then it's necessary to that one, not the first. Well, it may well be necessary to the vessel that it's going to. That does not necessarily mean that it is not also necessary to the vessel to which it is provided. Now, we distinguish this case from the general provision of cargo. Cargo supplied to a vessel that travels to another destination, first of all, is probably not even provided to the vessel within the maritime lineage. It is certainly not provided on the order of the owner. And I think just as this court held— I'm interested in that. Why wouldn't cargo be provided to the vessel carrier? It is not provided to the vessel. It is bailed to the vessel to be provided to the recipient. Okay, that's an interesting distinction. Why doesn't that apply here? Why wasn't the fuel that was to be delivered to the seismic vessel bailed to the support vessels and not provided to them? First of all, the owner of the supply vessel was the same as the owner of the seismic vessel. So there was no bill of lading issued. It was not a case of shipping fuel to a distant owner or purchaser. It was supplied to the owner of the ships into which it was pumped. If it met the other tests of cargo, if there were no other purpose of the supply vessel other than to ferry the fuel from A to B, we probably wouldn't have a case. Okay, so why doesn't that apply here? Because Judge Fallon Why isn't the purpose of the first two ships to ferry the fuel to the seismic vessels? Judge Fallon found that the purpose of those vessels went far beyond that. The primary purpose of those vessels was to hover around the seismic fleet and be prepared to tow them if they lost steerage or propulsion. But their general purpose was to service that fleet and to supply fuel as and when needed. The record shows in particular that the Miss Lily did not just go from Port Fourchon out to a ship and drop off the fuel. It dropped off fuel to three different ships over a period of two different ships on three different occasions over a period of 16 days. So just as your land-based gas station cannot carry out its particular function without fuel in its tanks, so Judge Fallon found that these vessels, these floating gas stations, could not perform their function as service vessels for the seismic fleet. Tell me what your best case is. Because I think one thing that I'm struggling with, and maybe the other panel members are, I don't know, is that when we read the cases, we see various items, both tangible and intangible, being provided to a vessel and a lien then attaching to that vessel. So it might be tangible things like fuel. It might be intangible things like insurance. But everything in those cases that I read is with respect to that vessel and not to another vessel. So what's your best case for this lien with respect to items that are provided to a vessel but for another vessel? I don't have a case specifically dealing with that scenario. I think you have to look at, as Equilee says, the particular function of the supplied vessel, in this case the support vessel. I assume you'd agree, we were talking about the Ninth Circuit case, the Foss Maritime case, which talked about a lien with respect to the containers themselves. Right. And so I get that. If you were providing the container itself and providing money for the container of the container itself, you have a lien with respect to that vessel because the container is necessary to the function of that vessel. But here we're talking about the contents of the container. Right. And that's where I'm having a little bit of trouble. What my opponent would say is that because Foss says there's a lien on the container, somehow that implies there is not a lien on the contents of the container. And that, we believe, is a non sequitur. You have to look at whether the contents of the container are being supplied to enable the supplied vessel to carry out its particular function. Now, just with a cargo ship generally that has containers, why wouldn't the principle that you're arguing for mean that every time cargo is delivered to a vessel to take to another vessel, a lien attaches to the carrying vessel with respect to the cargo? Well, the main reasons are twofold. First of all, I don't believe that that is provided to the vessel. Okay. And secondly, it is very unlikely that it is provided to the vessel on the order of the owner or an authorized agent. Right. But let's take a hypothetical then where the cargo is provided to the vessel because the owner of the supply vessel is the same as the destination vessel, and it's on the order of the owner of those two vessels. So that removes your distinctions. Well, then that would bring up the question of is the supplier relying on the credit of the vessel when he knows that the goods supplied are mere cargo. And in that case, he would have a bill of lading. He would know what the destination was. He would know that that destination was not, I guess it could be an offshore vessel. But there are those distinctions. And finally, there's a possibility that cargo is simply too disconnected from the vessel itself. We have Judge Jones' decision in the Gulf Maritime case saying an attorney's services in getting a lien released are not cargo. We also have a case of Judge Barksdale. Are not necessary. I'm sorry, are not necessary. We also have a case that Judge Barksdale was involved in. You're not going to hold that against me, are you? I'm not, and I don't have the citation handy. But there, Your Honor, held that a surety bond was not a necessary. And in both of those cases, it was because of the attenuated relationship between the object supplied and the vessel. And I think that would probably cover the ordinary cargo situation. So in summary, we think that the key to this case is Judge Fallon's finding that the vessels served more than a transport function. They served a general service function that included operating as floating gas stations. That is, providing general services. And the record showed that those services included the ferrying of personnel back and forth, data tapes, groceries, equipment, machine parts, fuel, and that those vessels were, at least in the case of the first two, the Bourbon Petrel and the OMS Resolution, specifically configured for that purpose. And in the case of the Miss Lily, retrofitted, if you will, for that purpose. So we think that the evidence supports Judge Fallon's finding that the particular function of these ships was broader than just transporting cargo. With respect to the Miss Lily, is there a fact-finding that the amount of fuel delivered to the vessel, the Miss Lily, was, I'm probably going to get this wrong, insufficient for the delivery to the destination seismic vessel? Is there a fact-finding on that? And the reason I'm asking is, of course, because of the diversion. There was not. There were some stipulated facts in the pretrial order, and I think it may have been in the pretrial order, and Mr. Diaz can correct me if I'm wrong, that the Miss Lily had on board sufficient fuel for its own needs. Now, let me, if I may, explain to you why I believe that's immaterial. In the ordinary case, a ship being provided with fuel for its own propulsion, the test for a necessary does not include whether the vehicle already has on board sufficient fuel to reach its destination. That would be an unworkable test. You pull up to my dock, and I say, before I can deliver fuel to you, I need to know how much is in your tanks, where you're going, how much fuel it's going to take you to get where you're going, and if you've already got enough fuel on board to reach your next port, then I won't have a maritime link. That can't be how it works. No, I mean, I think that makes sense to me, but here you have the fuel being delivered for ostensibly two purposes. One, to go to the seismic vessel. The other, ostensibly to fuel the support vessel. But let me talk about the state of Martin's knowledge of that scenario. Martin did know that these were support vessels for the seismic fleet. They did know that, in general, at times they were ferrying fuel to the seismic vessels. But the evidence from Martin's perspective, which Judge Fallon was entitled to credit, was that they did not know as to any fuel delivery, whether that fuel was going to be consumed by the vessel or whether it was going to be transported, and if so, to which seismic vessel. And what's the source of the principle that it's the knowledge of the entity providing that is determinative? There is no case that says that in so many words, but there are cases that speak to, Equalese, for example, says it is the present apparent want of the vessel. Right, I was about to ask you about that. Does that not cut against your argument that it's the want of the vessel and not the expectations of the one that's providing? Well, it has to be a necessary for these vessels. We concede that. The mere fact that it's going to be transported and eventually delivered to some other vessel does not necessarily preclude its being a necessary of this vessel. You have to apply the general test, look at the particular function of these vessels, and just as the liquor is going to be consumed by the passengers or the linens are going to be used by the passengers, that does not disqualify those goods and services from being necessaries if they're necessary to the function of the particular vessel. Here we believe the seismic vessels were the customers, if you will, of the support vessels, just as the passengers or what have you. My favorite case is one involving fumigation of passengers' baggage, and that was held to be a necessary. What case is that? Oh, we did not cite it in our brief. I'm sorry. Fumigation, all right. Yeah, fumigation of passengers' baggage. And the theory was if I'm going to have a passenger ship, I can't have it crawling with vermin. So in order for me to carry out my particular function, I have to fumigate the passengers' baggage, and that's a necessary. So it seems like to me that the basic analogy you're drawing is that if you have a passenger ship, the provision of liquor or linens or fumigation is a necessary with respect to that ship because of its function, right? Yes. And here the analogy you want to draw, and Judge Fallon evidently did too, is here we have not a passenger ship but a floating gas station. Yes. So therefore the provision of the gas is necessary. Gas station is useless if its tanks are empty. Okay. I got it. That is all I have to say on the necessary subject. Let me briefly, although Mr. Diaz didn't discuss it, discuss on the order of the owner or authorized agent. Here the evidence was ambiguous as to which of two scenarios applied. Number one, CGG tells O.W. Bunker, we need fuel. O.W. Bunker goes and gets two quotes, gives them to CGG, and CGG says, pick that one. There was evidence to that effect. There was also evidence from the same witnesses, same witness, that it was different, that it was a standing order, CGG to O.W. Bunker, pick the company with the lowest price. The district court was empowered to resolve that factual dispute, and he resolved it in our favor. The testimony and exhibits that he quoted supported the notion that on a case-by-case basis, CGG selected the provider of the fuel. That falls squarely within the court's general contractor test. I won't cover it here unless the court has questions, but we also argue in the brief that in the alternative it would support it under the middleman test where O.W. Bunker was acting as CGG's agent. Now, on the pre-judgment interest, give us your spiel on why it shouldn't take us back 30 days from date of purchase since that was what the contract provided. Well, the answer is— Other than just the broad discretion of the district court. Well, we are entitled to be compensated for the loss of use of the funds corresponding to the fuel, not necessarily for the loss of use of the funds corresponding to O.W. Bunker's failure to pay its invoice. We surrendered the fuel on day zero, even though O.W. Bunker wasn't obligated to pay us until day 30 and, in fact, never paid us. We have been without the use of that fuel from day zero. But you agreed to that. You agreed you're not going to get paid for 30 days. We agreed with O.W. Bunker that they could pay us after 30 days, but we didn't have any such agreement with CGG, and the standard is loss of use of the funds, and as it happened, we lost those funds the day we delivered the fuel. That's our argument. Unless the court has any other questions. Thank you, counsel. Mr. Diaz. I'll be very brief and take most of those arguments in reverse order. On the prejudgment interest, while a minor issue, I do believe that by virtue of the invoices that Martin Energy issued for the sale of its own bunkers, that the 30 days defines when the loss of use of the funds began. Martin has never contended that they themselves, if not sold to O.W. Bunker or to CGG or another party, would literally use the fuel, burn the fuel themselves. They would sell it to another party and sell it pursuant to the terms of their sales contract, which applies regardless of who the entity is, and those funds become due in owing within 30 days. Secondly, on the passengers aboard a vessel who are consuming alcohol, who are using the linens, who are the recipients of all of the extensions of necessaries, they are all on board the vessel to which the lien attaches, and it is a stretch of the imagination to define these very large seismic vessels as being somehow akin to a customer on the support vessels. And in fact, the Supreme Court in Piedmont says you cannot extend maritime liens by analogy. And not only is that an analogy, clearly, but it is a stretch of the imagination applying an analogy. These are separate vessels. These are seismic vessels that are consuming the fuel for propulsion. One of those seismic vessels which was seized in France and for which CGG paid for the fuel at issue here. And that that distinction, and I think it is an absolutely critical distinction on which vessel actually consumed the fuel, for which it is necessary, has to be answered. And it is not a stretch of a necessaries definition here. Bunkers have always considered to be necessaries, but the question is whether it is a necessary for the vessel that is subject to seizure. And they were not necessary for the propulsion and consumption by the vessels that were seized in this instance. In our TRECO decision, are you familiar with it? I am, and I cited it to the trial court. And not for an analogy, Judge. I cited it because it involved a factual situation that was very similar. Not a legal conclusion that was similar, but a factual one where supply vessels are going from a port and taking food, fuel, that the Fifth Circuit addressed, and taking it out to the Falcon drill rig. And the Fifth Circuit found that the provisioning and the use of the supply vessels to transport those goods was a necessary, because otherwise, that fuel, that food, that water, that drilling fluid, would never get out to the Falcon drilling rig. What the court didn't address, because it wasn't before them at the time, but it is quite clear from the decision, I believe, that the fuel and the water and the food that was aboard those supply vessels that went to the Falcon drilling rig were necessaries for the drilling rig. It was a jack-up. And it's a traditional vessel under longstanding precedent of this court. To draw a distinction or distinguish, there's some force to your argument. Well, these people are on the vessel. You've got to feed them. What about the advertising? What has that got to do to get the vessel from Bora Bora to New York City? If it's a cruise ship and you've got food for your passengers, you've just got to get back to New York City. Judge Barksdale, I believe that advertising is a bit of a stretch, but it's a bit of a stretch for that vessel, for that vessel and its passengers being aborted, not for another vessel for which those passengers are destined or for which that vessel may be carrying supplies to another destination. I think that I don't need to overcome that hurdle, because it is a bit of a stretch under maritime law, because the advertising is for the vessel that was subject to seizure. What about back to the image Judge Fallon sort of pressed, which is these ships wouldn't even exist if they weren't carrying fuel? No cargo vessel would. No cargo vessel could operate in a profit situation, but that doesn't mean it doesn't have the necessaries in order to function at a profit. So let's take the circumstance of an articulated barge that plies the Mississippi River. It has its own fuel, its own cables, and it has its tanks where it picks up refined products at various refineries along the Mississippi River. Sometimes it picks up number six low sulfur fuel that it itself burns and takes it somewhere else. Is it capable of that particular function? Does it have its own fuel, its own tanks, its own personnel, its own food, its own water in order to accomplish it before the cargo is ever taken on board? Absolutely. But maritime liens are not extended for the fulfillment of a voyage. It is only extended for the necessaries to perform the voyage. And I think it is telling. Sorry. I'm just, again, you're light. Do you want to wrap up? Yes. And I would like to end on this note,  where they sought to recover attorney's fees. It is telling that there is in the 100-year, 109-year history of the Maritime Lien Act, not a single case that supports Martin Energy's position here, and I think that's for a reason. Thank you. Thank you both.